FILED
United States Court of Appeals
Tenth Circuit

July 15, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

DENNIS DIONICIO GARCIA as
personal representative of the estate of
Marcelino Garcia, deceased; INEZ
MARIA GARCIA, individually and
jointly as parents and next friends of
Deja Bonet Garcia and Nicolas
Dionicio Garcia, minors,

      Plaintiffs - Appellants,

v.

UNITED STATES AIR FORCE;
JAMES G. ROCHE, Secretary of the
United States Air Force; CHENENGA
MANAGEMENT, LLC; NORTHEAST
CONSTRUCTION COMPANY OF
NEVADA; JOHN DOE, Contractor,

      Defendants,

         and

UNITED STATES OF AMERICA,

      Defendant - Appellee.

No. 07-2106

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. Nos. 04-CV-498-RB-LCS and 04-CV-499-RB-LCS)**

---

Jennifer Rozzoni (A. Brent Bailey of Dixon, Scholl & Bailey, P.A., on the briefs),
Albuquerque, New Mexico, for Plaintiffs - Appellants.

Adam M. Dinnell, Trial Attorney, Civil Division, Torts Branch, Environmental Torts Section, U.S. Department of Justice (and Gay E. Kang; Peter D. Keisler, Assistant Attorney General, Civil Division; J. Patrick Glynn, Director, Torts Branch; Joann J. Bordeaux, Deputy Director; David S. Fishback, Assistant Director; on the brief) Washington, D.C., for Defendant - Appellee.

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiffs (the "Garcias") brought this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, 2674, for personal injuries and damages sustained from exposure to toxic mold in their on-base housing unit at Holloman Air Force Base ("HAFB") in New Mexico. They allege that the mold resulted from water that penetrated their home through a leak in their roof, and that the government was negligent in failing to identify the leak in time to prevent the mold from developing. Finding that the government's actions fell within the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), the district court granted summary judgment for the government. The court also denied the Garcias' Fed. R. Civ. P. 56(f) request for a continuance to conduct further discovery as well as their Fed. R. Civ. P. 60(b) motion for relief from judgment, which was based upon evidence obtained from the private contractor that installed their roof. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

2

Between February 16, 1996 and August 23, 2002, the Garcias lived in an on-base housing unit at HAFB located at 2553A Valencia Loop ("Unit 2553A"). Prior to the Garcias taking possession of Unit 2553A, the government contracted with Northeast Construction Company ("Northeast") to renovate 113 on-base family housing units at HAFB, including Unit 2553A. The renovation involved converting the roof of Unit 2553A from a "low-slope" roof (slope or pitch of less than 250 millimeters per meter) to a "pitch" roof (slope or pitch of 250 millimeters per meter or more). The government recommended this type of "slope conversion" because pitch roofs typically last longer and require less maintenance than low-slope roofs. The renovation of Unit 2553A was completed prior to the Garcias taking possession of it.

On February 6, 1996, Dennis Garcia completed an inspection form for Unit 2553A. The form noted some minor cosmetic defects, but did not indicate any mold or water leaks. Ten days later, the Garcias moved into Unit 2553A. Between February 1996 and April 2001, the 49th Civil Engineering Squadron at HAFB was responsible for the maintenance and management of Unit 2553A, but the Garcias did not report any maintenance problems during that time period.

In May 2001, Chenega Management, LLC ("Chenega") became responsible for the maintenance and management of Unit 2553A. Subsequently, the Garcias

3

experienced some maintenance problems with their unit, each of which was resolved by Chenega. For example, on September 6, 2001, the Garcias reported a water leak in the ceiling. Chenega fixed the problem on September 10. On October 15, they reported a spongy, discolored area on a wall. On November 26, Chenega repaired the wall. On November 30, the Garcias reported that sheetrock had fallen over the water heater. Chenega fixed that problem on December 3. On May 8, 2002, they reported mildew on a bedroom wall. Chenega re-grouted and re-caulked a shower to fix the problem. On May 24, the Garcias reported that the dishwasher was spraying water all over the kitchen. Chenega subsequently fixed the dishwasher.

It was not until the summer of 2002 that the Garcias first asked Chenega to evaluate the mold that they now claim caused their physical injuries. The government responded by housing the Garcias in a hotel from August 4 to August 19. On August 23, the Garcias moved out of Unit 2553A into off-base housing. That same day, SafeNet Environmental Services prepared a mold identification report for Chenega. The report stated that on August 12, SafeNet found visible fungal growth with varying degrees of spore concentrations depending on the location within Unit 2553A. On November 21, 2002, the Clayton Group prepared a mold assessment for the government. That assessment found that the air in Unit 2553A did not exceed Occupational Safety and Health Administration standards

4

and did not indicate high levels of toxic mold. Neither SafeNet nor the Clayton Group definitively identified the cause of the mold.[1]

The Garcias subsequently filed administrative claims with the government, which were denied. The Garcias then filed this suit against the government pursuant to the FTCA. They also brought various state-law claims against Northeast and Chenega. Arguing that the discretionary function exception bars the Garcias' suit, the government moved to dismiss for lack of subject matter jurisdiction, or in the alternative, for summary judgment. The government included two sworn declarations concerning the lack of any mandatory residential roof inspection policies. In addition to responding to the merits of the government's motion, the Garcias requested a Rule 56(f) continuance to conduct further discovery. The district court denied the Rule 56(f) request, construed the government's motion as a motion for summary judgment because jurisdictional issues were intertwined with the merits of the case, and granted summary judgment to the government. See Aplt. App. at 312, 314, 321.

Following the court's decision, the Garcias obtained additional evidence regarding the applicability of the discretionary function exception from discovery

---

[1] Nothing in the record shows when the leak in the Garcias' roof occurred or that the mold in the Garcias' home developed as a result of a leak in their roof. Neither SafeNet nor the Clayton Group definitively identified the cause of the mold—both organizations recommended that the source of the mold should be investigated. See Aplt. App. at 126; Aplee. Supp. App. at 52. However, the record is silent as to whether any such investigation ever took place.

5

with Northeast and, on the basis of that evidence, filed a Fed. R. Civ. P. 60(b) motion for relief from judgment. The district court construed the motion under Fed. R. Civ. P. 54(b) as the court had not yet entered final judgment, Aplee. Supp. App. at 37-38, and reaffirmed the applicability of the discretionary function exception notwithstanding the new evidence. Id. at 41-49.

The Garcias' claims against Northeast and Chenega were subsequently dismissed with prejudice pursuant to settlement agreements, making the district court's decisions ripe for appeal. See Jackson v. Volvo Trucks N. Am., Inc., 462 F.3d 1234, 1238 (10th Cir. 2006).[2] On appeal, the Garcias make three arguments: (1) the grant of summary judgment was inappropriate because the government failed to follow mandatory Air Force policies governing the periodic inspection of their roof—in holding otherwise, the district court improperly weighed evidence; (2) the denial of their Rule 56(f) request was error; and (3) the denial of their motion for relief from judgment was error because new evidence showed that the government had voluntarily assumed a duty to inspect their roof. We address these arguments in turn.

---

[2] Before Northeast and Chenega were dismissed from this litigation, the Garcias filed a premature notice of appeal (No. 05-2289) which was terminated by this Court on March 20, 2006. See Aplt. App. at 24.

Discussion

I.

A. Standard of Review

We review the district court's determination of the applicability of the discretionary function exception de novo, considering the allegations in the complaint as well as the evidence in the record. Duke v. Dep't of Agric., 131 F.3d 1407, 1409 (10th Cir. 1997). As the district court granted summary judgment for the government, we determine only whether the discretionary function exception applies, a jurisdictional issue, and make no judgment on the merits of the case. Id. Viewing all evidence and drawing all reasonable inferences therefrom in the light most favorable to the nonmoving party, Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1222-23 (10th Cir. 2008), we determine that summary judgment is appropriate if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

B. Discretionary Function

The FTCA waives sovereign immunity for actions against the United States resulting from injuries caused by the negligent acts of governmental employees while acting in the scope of their employment. See 28 U.S.C. § 1346(b)(1). The United States can be held liable "in the same manner and to the same extent as a private individual under like circumstances." Id. § 2674. Excluded from this

7

waiver of immunity are claims based on the performance of "a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). This "discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." Aragon v. United States, 146 F.3d 819, 823 (10th Cir. 1998) (quotations omitted). "If the discretionary function exception applies to the challenged conduct, the United States retains its sovereign immunity and the district court lacks subject matter jurisdiction to hear the suit." Domme v. United States, 61 F.3d 787, 789 (10th Cir. 1995). When, as here, the jurisdictional question is intertwined with the merits of the case, the government's motion should be construed as a motion for summary judgment, not a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. See Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir. 1987). The discretionary function exception applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Thus, the question of negligence is irrelevant. Aragon, 146 F.3d at 822.

The discretionary function exception is designed to protect policymaking by the executive and legislative branches of government from judicial "second-guessing." United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984). Thus, it "marks the boundary between Congress' willingness to impose tort liability upon the United

8

States and its desire to protect certain governmental activities from exposure to suit by private individuals." Id. at 808. Among those activities encompassed by the discretionary function exception are "the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." Id. at 813-14. "The same holds true of other administrative action not of a regulatory nature, such as the expenditure of Federal funds, [or] the execution of a Federal project. . . ." Id. at 810 (quotation omitted).

To determine whether conduct falls within the discretionary function exception, we apply the two-part test set forth by the Supreme Court in Berkovitz v. United States, 486 U.S. 531, 536 (1988). See Lopez v. United States, 376 F.3d 1055, 1057 (10th Cir. 2004). First, we ascertain the precise governmental conduct at issue and consider whether that conduct was "discretionary," meaning whether it was "a matter of judgment or choice for the acting employee." Berkovitz, 486 U.S. at 536. Conduct is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." Id.

If the first element of the Berkovitz test is satisfied, we then consider the second element—whether the decision in question is one requiring the exercise of judgment based on considerations of public policy. Id. at 536-37. In so doing, we do not consider the employee's "subjective intent in exercising the discretion

conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." United States v. Gaubert, 499 U.S. 315, 325 (1991).

If both the first and second elements of the Berkovitz test are met, the discretionary function exception to the waiver of sovereign immunity applies. Stated another way, if a plaintiff can establish that either element is not met, the plaintiff may proceed because the exception does not apply. Sydnes v. United States, 523 F.3d 1179, 1183 (10th Cir. 2008).

C. Application

On appeal, the Garcias argue that the government's conduct was not discretionary but do not assert any arguments with respect to the second prong of Berkovitz. Therefore, we address only whether the challenged government conduct at issue here was discretionary. See Fed. R. App. P. 28(a)(9)(A); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) (explaining that arguments inadequately briefed are waived).

The Garcias argue that the government's conduct was not discretionary because the government failed to follow specific, mandatory policies governing the periodic inspection of their roof, as set forth in "Air Force Civil Engineer Support Agency Field Guide: Pitched Roofing Systems, Inspection, Evaluation, and Maintenance Criteria" (the "AFCESA Field Guide"), dated November 1996, and Air Force Instruction ("AFI") 32-1051, dated May 13, 1994. They argue that

10

the district court improperly weighed evidence in concluding otherwise. They

also rely on AFI 33-360, dated January 30, 2004, in arguing that AFI's require

direct compliance at all levels of the Air Force. They claim that had the

government adhered to these policies, it would have identified the leak in their

roof and corrected the problem before mold could develop.[3] We have reviewed

each of these documents and conclude that none of them prescribe a specific,

mandatory course of conduct regarding the inspection of the Garcias' roof.

The AFCESA Field Guide clearly states that it is only a "field guide"

whose purpose "is to provide ready reference for establishing and conducting a

roof management program for steep-sloped roofing systems." Aplt. App. at 468.

In addition, the AFCESA Field Guide is silent with respect to when roof

inspections are to occur.[4] Thus it does not prescribe a mandatory course of

conduct that the government was required to follow with respect to the periodic

inspection of the Garcias' roof.

AFI 32-1051 does not apply to the type of roof on Unit 2553A. As

described earlier, Northeast converted the roof on Unit 2553A from a low-slope

---

[3] Before the district court, the Garcias also claimed that the government failed to follow mandatory policies governing the testing of indoor air quality as well as the containment, eradication and remediation of mold. On appeal, they do not press these arguments and have thus waived them. See Fed. R. App. P. 28(a)(9)(A); Adler, 144 F.3d at 679.

[4] The Garcias have only included selected pages of the AFCESA Field Guide in their appendix and therefore our analysis pertains to only those pages.

11

roof to a pitch roof sometime prior to the Garcias taking possession. AFI 32-1051

sets forth guidance on Air Force management of low-slope roofs, not pitch roofs.

Throughout AFI 32-1051, the instruction refers to manuals that pertain to the

maintenance of "membrane" or "built up" roofs, see id. at 188, 190, 191, 194-97,

which are types of low-slope roofs, see id. at 467. AFI 32-1051 only refers to

pitch roofs in two places, neither of which specifically requires the Air Force to

conduct periodic inspections of pitch roofs. Id. at 188-89. In fact, AFI 32-1051

expressly states in reference to pitch roofs that "[t]he user monitors these roofs,

and roof maintenance personnel respond to complaints according to the

warranty." Id. at 188. Thus, AFI 32-1051 expressly provides that the Garcias

were responsible for monitoring their roof, not the government.

The Garcias' argument that the application of AFI 32-1051 is not limited to

low-slope roofs is meritless. Essentially, they discuss certain AFI 32-1051

provisions out of context and ask us to infer that these provisions apply to their

roof. For example, they rely on paragraph 11, which provides inspection

procedures for "low-slope red category roofs" and "low-slope green category

roofs" but "all yellow category roofs." Id. at 193-94. The Garcias argue that

"[t]here would be no need to single out 'low-slope' if AFI 32-1051 only applied

to low slope roofs" and thus it is reasonable to infer that AFI 32-1051 applies to

all roofs. Aplt. Br. at 10. As an initial matter, the Garcias do not expressly state

that their roof constitutes a "yellow category" roof or offer any evidence to

12

support such a claim. Regardless, the Garcias ignore paragraph 6, which expressly provides that the red, yellow, and green condition categories pertain to low-slope roofs. See Aplt. App. at 190 (instructing roof engineers to make a "facility list of all base low-slope roofs, then divide[] the list into three condition categories: red; yellow; and green"). We therefore reject the Garcias' reading of AFI 32-1051. Similarly, we reject their reliance on paragraph 8 for the proposition that Air Force roofing inspectors are required to "confirm leak tightness of newly constructed roofs," implying that the Air Force was obligated to inspect their roof after it was renovated by Northeast. Aplt. Br. at 9. The provision on which the Garcias rely specifically refers to yellow category roofs and is thus inapplicable to the Garcias' roof. See Aplt. App. at 191.

In addition, although AFI 32-1051 generally provides that compliance with it is required, it does not mandate compliance with any specific roof inspection procedures. Pursuant to AFI 33-360, AFI 32-1051 contains a banner stating "compliance with this publication is mandatory." Id. at 188, 459. However, AFI 32-1051's first sentence states that it merely "provides guidance for establishing and maintaining a roof management program." Id. at 188. AFI 32-1051 simply does not contain specific, mandatory roof inspection directives. Cf. Aragon, 146 F.3d at 824 (finding general compliance with executive order mandatory but use of term "as practicable" was "prime example of discretionary language"; order alone did not provide specific, mandatory Air Force directives).

13

The Garcias argue that AFI 32-1051 requires Air Force roofing inspectors to "monitor the work of all roofing contractors on a daily basis and accept or reject a contractor's roofing work on a daily basis," again implying that the Air Force was obligated to inspect Northeast's work during the renovation of the Garcias' roof. Aplt. Br. at 9. However, AFI 32-1051 also states that "[t]he contractor is responsible for quality control" and "[t]he Air Force inspector's job is to monitor the contractor's quality control program. During the first few days, remain at the job for several hours each day to observe the contractor's quality control program. After the contractor achieves a satisfactory level of confidence, you can reduce the time." Aplt. App. at 197 (emphasis added). Thus, AFI 32-1051 clearly delegates quality control to independent contractors and provides the Air Force with discretion in monitoring that quality control—these oversight provisions are not sufficiently specific to establish government liability. Cf. Elder v. United States, 312 F.3d 1172, 1177-78 (10th Cir. 2002) (finding mandatory National Park Service safety guidelines not sufficiently specific to remove decisionmaking under them from discretionary function exception). The language alone compels such a conclusion, and we reject the argument that the district court weighed evidence in reaching this legal conclusion. Accordingly, the Garcias have not identified any specific directives that mandated the

14

government to periodically inspect their roof and the district court was correct to grant summary judgment for the government.[5]

II.

Concurrent with the Garcias' response to the merits of the government's motion to dismiss/motion for summary judgment, the Garcias' counsel submitted a Rule 56(f) affidavit requesting a continuance to obtain additional discovery. The affidavit stated that

> A. Plaintiffs have not had an opportunity to discover the Defendant's safety and habitability policies for its [sic] on-base housing at [HAFB]; B. Plaintiffs have not had an opportunity to discover the reasons that Defendant has a policy for mold identification, surveillance, and remediation; and C. Plaintiffs cannot completely respond to Defendant's claim that its [sic] conduct in this case was in all respects discretionary.

Id. at 159.

Rule 56(f) provides:

---

[5] Judge Lucero suggests that if he were interpreting the discretionary function exception as a matter of first impression, he would interpret the FTCA as allowing mandatory duties to arise from state tort law, not just a federal statute, regulation, or policy. We note that the Tenth Circuit has recently rejected a similar argument. See Sydnes, 523 F.3d at 1184 ("Considering state tort law as a limit on the federal government's discretion at the jurisdictional stage impermissibly conflates the merits of plaintiffs' claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in the first place. Indeed, the only conceivable way plaintiffs might succeed on their theory is by pointing to a federal policy incorporating state tort law as a limit on the discretion of federal employees with[in] the meaning of the FTCA.") (emphasis in original).

15

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

Fed. R. Civ. P. 56(f) (2008).[6]

The district court denied the request, finding that the Garcias' counsel did not specify what would be revealed by further discovery, nor did he explain how additional information would allow the Garcias to rebut the government's evidence that there were no Air Force directives, instructions or standards that required the Air Force to inspect their roof for leaks or home for mold. The court further noted that discovery had been underway for six months at the time of the Rule 56(f) request and the Garcias had access to the policies the government provided in support of its motion. See Aplt. App. at 313-14.

We review the district court's denial of a Rule 56(f) request for an abuse of discretion. Libertarian Party of N.M. v. Herrera, 506 F.3d 1303, 1308 (10th Cir. 2007). "A party seeking to defer a ruling on summary judgment under Rule 56(f) must 'file an affidavit that explain[s] why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available

---

[6] Rule 56(f) was restyled in 2007 and we use the current version as no substantive changes were made to the rule in 2007. See Advisory Committee Notes, 2007 Amendments.

and what steps have been taken to obtain these facts.'" Id. (quoting Trask v. Franco, 446 F.3d 1036, 1042 (10th Cir. 2006)) (alteration in original). A party may not invoke Rule 56(f) "by simply stating that discovery is incomplete but must 'state with specificity how the additional material will rebut the summary judgment motion.'" Id. at 1308-09 (quoting Ben Ezra, Weinstein, & Co. v. Am. Online Inc., 206 F.3d 980, 987 (10th Cir. 2000)).

The Garcias' challenge to the district court's decision essentially recites Rule 56(f) and summarizes the district court's decision. They do not make any legal arguments or cite any authority to support their position. See Adler, 144 F.3d at 679. Regardless, the affidavit submitted by the Garcias' counsel failed to identify any specific facts which would create a genuine issue of material fact, let alone identify what steps had been taken to obtain such facts and a plan for the future. In addition, the Garcias already had six months to conduct discovery prior to their request and Rule 56(f) "does not compel the court to grant a continuance to a party that has been dilatory in conducting discovery." Bolden v. City of Topeka, Kan., 441 F.3d 1129, 1151 (10th Cir. 2006). Therefore, the district court did not abuse its discretion by denying the request.

## III.

Following the district court's grant of summary judgment for the government, the Garcias obtained additional evidence from discovery with Northeast that they claimed showed the government voluntarily assumed a duty to

17

inspect their roof during Northeast's renovation of Unit 2553A and warrant the roof installation. See Bell v. United States, 127 F.3d 1226, 1229 (10th Cir. 1997) (explaining that government's voluntarily assumed contractual obligations can impose nondiscretionary duties on government employees). On the basis of this evidence, the Garcias filed a Fed. R. Civ. P. 60(b) motion for relief from judgment, arguing that the discretionary function exception was inapplicable to their claim that the government was negligent in retaining and supervising Northeast. The district court construed the motion under Fed. R. Civ. P. 54(b) because final judgment had not yet been entered, and concluded that the newly discovered evidence did not support the Garcias' claims and that the discretionary function exception still applied. See Aplee. Supp. App. at 43-49.

We review a district court's Rule 54(b) reconsideration of its prior interlocutory decision de novo. See Raytheon Constructors Inc. v. ASARCO Inc., 368 F.3d 1214, 1217 (10th Cir. 2003). The Garcias' motion was based upon three documents obtained from Northeast: (1) Contract No. F29651-93-C-0012 between Northeast and the government regarding Phase I of Northeast's upgrade of 113 housing units on HAFB (which included Unit 2553A) (the "Phase I Contract"); (2) Air Force specifications for the Phase I Contract ("Specifications"); and (3) a "Stipulation of Settlement and Agreement" between the government and Northeast entered into on December 15, 1995 ("Settlement Agreement"). See Aplt. App. at 337-56. The Garcias also attached the affidavit of T.J. Hiehle, the

18

former president of Northeast, to their responsive pleadings before the district court.  Id. at 438-41.

We have reviewed this evidence and agree with the district court that nothing contained therein changes the conclusion that the discretionary function exception precludes the Garcias' suit.  According to the Garcias, the Phase I Contract and Specifications provided Northeast with "detailed plans, specifications and direction" regarding Northeast's renovation of Unit 2553A, thereby eliminating any government discretion regarding the renovation.  Aplt. Br. at 15.  The Garcias claim that government inspectors, pursuant to the Phase I Contract and Specifications, were required to inspect the renovation to ensure that the roof installation was "weathertight" and provided adequate moisture protection.  Id.  We disagree.

The Phase I Contract merely provides that the "Base Civil Engineer or his authorized representative is designated as the representative of the Contracting Officer for the purpose of technical surveillance of workmanship and inspection of materials for work being performed under this contract."  Id. at 382.  Neither this provision, nor any other in the Phase I Contract, prescribes specific inspection procedures with respect to the Garcias' roof.

The Garcias' reliance on the Specifications is also without merit.  The provisions quoted by the Garcias apply to Northeast, not the government.  The

19

Garcias have not pointed to any provision in the Specifications that mandates specific inspection procedures for the government.

Mr. Hiehle's testimony does not help the Garcias' case either. As an initial matter, Mr. Hiehle was an employee of Northeast, not the government, and we question whether the testimony of a private contractor is sufficient to show the discretionary function exception should not apply. Regardless, his testimony merely provides that the government "provided an inspector and project manager to oversee construction performed under the Phase I Contract," and that government "inspections were performed to ensure that construction was performed in accordance with the [Specifications]." Id. at 439. Mr. Hiehle does not state that the government was required to perform specific inspection procedures or that it violated such an obligation.

The Garcias also argue that under the Settlement Agreement, the government agreed to warrant the renovation of Unit 2553A. Aplt. Br. at 15. This claim is belied by the Settlement Agreement itself. The Settlement Agreement, which resolved a dispute between Northeast and the government, provides that the government would perform all remaining work on housing units after December 15, 1995 at the government's expense and that Northeast "will not be held responsible for any warranty work in any housing unit not accepted by the Government" by the same date. See Aplt. App. at 340-41. The Garcias have not pointed to any evidence that the government warranted the renovation of Unit

20

2553A let alone any evidence that Unit 2553A was completed after December 15, 1995. The Settlement Agreement does not prescribe specific inspection procedures for the government with respect to the Garcias' roof.

Thus, the instant case is readily distinguishable from Bell v. United States, on which Garcias primarily rely. In Bell, the government contracted with a state engineering commission to supervise compliance with safety specifications regarding the expansion of a reservoir. 127 F.3d at 1227. The contract specifically required the engineer to remove a pipeline to facilitate the excavation. Id. at 1227-28. However, during construction, the government's supervisor allowed the contractor to leave the pipeline in place, in direct violation of the government's specific contractual duty. Id. at 1228. The plaintiff later became injured when he dove into the reservoir and hit the submerged dirt embankment covering the pipeline. Id. at 1227. The Tenth Circuit held that the discretionary function exception was inapplicable because the contract did not provide the government supervisor with any discretion regarding the removal of the pipeline. Id. at 1230.

By contrast, the government in the instant case merely agreed to provide an inspector and project manager with unspecified duties. Nothing in the record shows that the government assumed, let alone breached, any specific contractual obligation that imposed specific inspection related duties.

21

The Garcias also rely on <u>Ayala v. Joy Manufacturing Company</u>, 877 F.2d 846 (10th Cir. 1989), and <u>Camozzi v. Roland/Miller & Hope Consulting Group</u>, 866 F.2d 287 (9th Cir. 1989), to support their position. However, each of these cases is inapposite. In both <u>Ayala</u> and <u>Camozzi</u>, the government retained responsibility for ensuring compliance with safety precautions, but directly violated or failed to effectuate those policies altogether. <u>Ayala</u>, 877 F.2d at 848-49 (government inspector gave specific instructions that directly contradicted specific government safety regulations); <u>Camozzi</u>, 866 F.2d at 289-90 (government failed to conduct inspections pursuant to contracts). Here, the Garcias have failed to identify any specific, mandatory government inspection procedures, let alone show how the government failed to conduct them. To the contrary, they have supplied evidence that the government provided inspectors and that inspections were performed. Aplt. App. at 439. Nothing in the record shows that the inspectors lacked discretion in performing those inspections. Accordingly, the Garcias' position is without record support and our conclusion that their suit is precluded by the discretionary function exception is unchanged.

AFFIRMED.

07-2106, Garcia v. United States

**LUCERO**, J. concurring.


I join the majority opinion of my respected colleagues, but write separately to express my disagreement with the consequences of our decision. As a result of our ruling, an airman has been denied the ability to sue his landlord for an alleged failure to provide habitable housing merely because his landlord is the federal government.

As I see it, the Air Force, like all other landlords, must provide habitable housing to its tenants in facilities such as those involved here in exercise of its basic common-law duties of care. Through the Federal Tort Claims Act ("FTCA"), the government has waived its sovereign immunity against tort suits arising out of the violation of such common-law duties. See 28 U.S.C. §§ 1346(b)(1) & 2674. Although the discretionary function exception limits the scope of this waiver, see § 2680(a), I would not, if interpreting the statute as a matter of first impression, read the exception so broadly as to obliterate the waiver's purpose. That is, the FTCA allows all tort claims against the government to proceed unless the government official involved was acting in a classically governmental role—exercising limited discretion to choose among various options on the basis of an expressed public policy.

In my view, our FTCA caselaw has distorted the analysis under United States v. Berkovitz, 486 U.S. 531 (1988), such that any action by the government

will be treated as discretionary unless it is mandated by a "federal statute, regulation, or policy." See, e.g., Domme v. United States, 61 F.3d 787, 789 (10th Cir. 1995). But as I read Berkovitz, those duties dictated by statutes, regulations, and policies are a nonexclusive list of mandatory conduct. See 486 U.S. at 536. The government may still be obliged to carry out certain duties, and a written statement is merely the clearest form of proof. I see no reason to assume that in waiving the federal government's sovereign immunity to tort claims, which are creatures of state law, Congress did not expect state-law duties to have mandatory effect. Cf. Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008). To interpret Berkovitz otherwise allows the government to avoid common-law duties of care, so long as it does not codify those duties in a federal publication employing mandatory language.

Had the Garcias not abandoned any argument that the Air Force's actions failed under the second prong of Berkovitz, the outcome of this case might well have been different. This prong asks whether the relevant government official's decision reflects an exercise of judgment based on public policy "of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536. The Garcias' case might have fallen under our precedent that limits the kinds of decisions that will be treated as matters of public policy subject to the discretionary function exception. See, e.g., Boyd v. United States, 881 F.2d 895, 898 (10th Cir. 1989).

-2-

Nevertheless, constrained by our current precedent and those arguments advanced by the parties, I am compelled to concur in the judgment, and do so.

07-2106 - *Garcia v. United States Air Force*

**HARTZ**, Circuit Judge, concurring:

I concur in the result and join all of Judge Kelly's opinion, except that I do not think it necessary to decide whether AFI 32-1051 applies to pitch roofs.